J. R. Swan, J.
The only question we deem it necessary to con- *287 eider in this case is, whether the policy became void by the appropriation of the building insured to other purposes than those mentioned in the policy.
The property described in and covered by the policy, is a “ brick flouring-mill and engine-house, steam-engine, with all the machinery thereto attached and belonging, necessary for manufacturing flour with steam power, situate,” etc. The insurers covenant, in terms, “ according to the provisions of their act of incorporation, by-laws, and conditions annexed, to settle with and pay to Harris all losses and damages which may happen,” etc., during the time the policy shall remain in force.
*One of the by-laws annexed to the policy is as follows:
“If the insured shall alter or enlarge a building, or appropriate to other purposes than those mentioned in the policy, so as to increase the risk, the same shall, ipso facto, become void: provided that, in ■case of such alteration, enlargement or change of use, if the insured shall, within sixty days, and previous to any occurrence of loss on the property insured, give notice thereof to the clerk, the policy may be renewed by the board of directors on such terms as they shall deem equitable."
The conditions annexed to the policy contain a subdivision of .goods, etc., into three classes — not hazardous, hazardous, and extra-hazardous. “ The following trades and occupations, goods, wares, and merchandise, are denominated extra-hazardous: . . coach-makers, . . coopers, . . Memorandum. — Grist-mills, fulling-mills, and other mills, . . . will be insured at special rates of premium.”
During the existence of the policy, and on the 20th July, 1845, the premises were destroyed by fire. For the period of about three months before, and down to the time of the fire, the mill had not been running. It had been undergoing some repairs. The repairs, however, had been finished about one month before the fire occurred. The fire commenced in the thi$d story, about midnight. It was seen in the third story before the flames burst out upon the roof, and articles were taken from the second story after the fire had commenced. No fire was kept at the mill; no one slept there. The plaintiff had slept there some weeks before, but had removed his furniture from the mill, and lodged at a public house a short distance from the mill. He was seen leaving the mill on the night previous to the fire, after sundown. The bolting cloths were not in *288, 289 the mill when it was burned down. These facts do not justify the court in believing that the mill was set on fire.
During a part of the three months previous to the fire, the plaintiff' and his son were engaged in the business of making tubs *and churns, in the third story of the mill. The quantity made is not proved, nor would such a fact, in general, be susceptible of proof. One of the plaintiff’s witnesses thinks the plaintiff made a dozen or go wash-tubs, but does not know the quantity. Two witnesses of the defendant purchased tubs of the plaintiff, and one of them says that Harris worked at coopering as it was ordered; coopered now and then, as people wanted the articles; on a few occasions to pass time; manufactured tubs and churns for‘sale; and was not there, probably, more than half of the three months. There were piles of staves and a considerable quantity of shavings sometimes, in the-third story, where he and his son worked.
It appears, from the proof, that Harris and his son manufactured tubs and churns, in the third story of the mill, for a few weeks before the fire, and Harris sold the wares.he manufactured. 'Proof of the quantity of the articles manufactured may he an important element in determining whether the trade was actually carried on, when there is an absence of all proof of the sale of the articles or the object for which the articles were manufactured; but when there is, as in this case, satisfactory proof that the articles were manufactured to sell, and that the extent of the manufacture and trade was only limited by the amount of the orders received for the articles, the quantity manufactured is of little or no consequence.
It is insisted that the trade must be carried on for such a period-of time, and in such manner, as to be habitual or permanent. This may in some eases be true, but not to the extent, nor, in general, is the rule applicable in the sense claimed by the counsel for the plaintiff.
In 2 Greenleaf’s Ev., see. 408, the general rule is stated, that “ The change of use must be habitual or of a permanent character. Thus, where the policy was on premises ‘where no fire is kept and where-no hazardous goods are deposited,’ a loss occasioned by making a fire once on the premises and heating tar, for the ^purpose oí making repairs, was held covered by the policy. And where a kiln, used for drying corn, was upon on? occasion used for the more dangerous process of drying bark, whereby the building took fire and. was consumed, the underwriters, on-, the same were held. *290 liable.” As authority for this statement, he refers to the cases of Dobson v. Sotherby et al., and Shaw v. Robberds.
Upon an examination of the tar-barrel case, Dobson v. Sotherby et al., 22 Eng. C. L. 260; it will be found that the building insured was of a kind which required the use of tar to repair the roof. The roof required tarring, and a tar-barrel was brought into the building, and the tar there heated by a fire, for the purpose of performing the necessary operation. The court did not decide the case upon the fact that a fire and tar were introduced into the building upon one occasion, but say, “ That the condition must be understood as forbidding only the habitual use of fire, or the ordinary deposit of hazardous goods, not their occasional introduction, as in this case, for a temporary purpose, connected with the occupation of the premises. The common repairs of a building necessarily require the introduction of fire upon the premises,” etc.
The rule to be deduced from this ease is, that although the policy forbid fire to be kept, or hazardous goods to be deposited in a building, such stipulation was not intended to cover, and does not cover, fire or hazardous goods necessary to make ordinary repairs, and used on the premises for that purpose.
The other case cited by G-reenleaf is Shaw v. Robberds et al., 33 Eng. C. L. 12; and was as follows:
The plaintiff insured a granary, etc., and “kiln for drying corn, in use.” The condition of the policy was that, “ If a building contain a kiln, or any process of fire-heat, other than the ordinary risk of common fires in private houses, the same must be noticed in the policy; and that if the risk of fire to which such building is exposed be by any means increased, such ^increase of risk must be immediately notified and allowed by indorsement on the policy, otherwise the insurance as to such buildings or goods will be void.” The kiln was used for drying corn, and for no other purpose. A vessel laden with oak bark was sunk, and the owner of the bark was permitted by the insured, as an act of kindness and gratuitously, to dry the bark in the kiln for drying corn. No notice of this was given to the insurers. The fire in the kiln for drying the bark was not larger than that usual in the case of drying corn. While the bark was drying, and on the third day after the commencement of that process, the kiln and all . the premises took fire and were consumed. The jury found that the trades of drying bark and drying corn were different; that the drying bark *291 was the more dangerous; and that the fire was occasioned by drying it. The court say: “ Perhaps if the plaintiff had made any •charge for drying this bark, it might have been a question for the jury, whether he had done so as a matter of business, and whether •or not he had thereby (although it was the first instance of bark drying) made an alteration in his business within the meaning of that condition. But according to the evidence, we are clearly of the opinion that no such question arose for the consideration of the jury; and that this single act of kindness was no breach of the ■condition.” Ho rule of law is to be drawn from this case. It is simply the shipwreck of principle upon the generous impulses of the court. It was a case of hardship on the plaintiff, who had suffered for his kindness, and seems to be so regarded in England. 46 Eng. C. L. 19, note. It will also be observed that there was no provision in the conditions of the policy relating to an alteration of the trade; but it was clear that the risk of fire had been increased, for it was so found by the jury; and one of the conditions of the policy distinctly provided for increased risk by fire.
It seems to be settled that where the condition of a policy renders it void, if the building is appropriated or used for any *trade or for storing any articles denominated hazardous or extra-hazardous, the temporary use, or the carrying on temporarily, ef any of the trades so denominated, for the purpose of ordinary repair, or the articles so denominated are introduced into the building to be used in ordinary repairs, or to be consumed in domestic use, the insurers are, notwithstanding, liable. O’Neil v. Buffalo Ins. Co., 3 Comst. 122.
So, the carrying on the trade and business of soap manufacturing, although extra-hazardous, yet the making of soap by a family, from spoiled meat, on one or more occasions, would not come within •a condition forbidding such a business or trade. Gates v. Mad. Co. Mut. Ins. Co., 1 Seld. 479.
Courts, in speaking of the trades forbidden by the condition, and to distinguish them from repairs, etc., have said of the one, that it was temporary, and of the others, that they were habitual or permanent. But if, from this language, it is to be supposed when a building is actually appropriated to a trade forbidden by the condition, that it must be so long carried on that it becomes habitual or permanent, would be grounding a principle upon mere words. For instance, if the insured opens a drug store in one of the rooms *292 cst the insured, building (it being a forbidden trade), must the trade become habitual or permanent before the condition is broken? Surely not. So, if the insured take the steps necessary to carry on the forbidden trade; does sufficient to show that he intends to manufacture for and sell to the public; begins to manufacture upon the premises, so that the risk actually commences, he can not excuse himself from the consequences of his own deliberate act, by showing that he carried on the trade but a short time, or that sufficient time had not elapsed for the trade to become permanent. If the insured, at the request of a neighbor, or for his own household, make an article which the forbidden trade usually manufactures, this would not forfeit his policy. It is not what the condition of the policy intended to cover. But if, as in the case now before the court, the insured manufactures *the articles of the forbidden trade for the public, and for gain, to the extent which the market demands, the question of habit or permanence does not arise, and he at once forfeits his policy, according to the condition and by-laws annexed thereto.

Bill dismissed.

Ranney, J., being a member of the insurance company, did not participate in the hearing or decision of this cause.